```
1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2
                          MIAMI DIVISION
3
                 CASE NO.:  18-mj-03700-JG-1
4

5

6

7   UNITED STATES OF AMERICA,     )
                                   )
8           Plaintiff,             )
    v.                             )
9                                  )           December 3, 2018
    JORGE ALBERTO PEREZ, et al.,   )
10                                 )
            Defendants.            )           Pages 1 - 73
11   _____/

12

13

14

15                     DETENTION HEARING

16         BEFORE THE HONORABLE JONATHAN GOODMAN
               UNITED STATES MAGISTRATE JUDGE
17

18

19

20   APPEARANCES:

21
     On behalf of the Plaintiff:
22
                        UNITED STATES ATTORNEY'S OFFICE
23                      99 NE 4 Street,
                        Miami, FL 33132
24                      BY:  FRANK TAMEN, AUSA.

25
```

APPEARANCES CONTINUED:

On behalf of Defendant Jorge Alberto Perez:

                            GEORGE T. PALLAS, P.A.
                            1999 SW 27th Avenue
                            Miami, FL 33145
                            BY:  GEORGE T. PALLAS, ESQ.

On behalf of Defendant Alexey Aguilera:

                            DEFABIO BECKHAM SOLIS, P.A.
                            2420 Coral Way
                            Miami, FL 33145
                            BY:  JOEL DEFABIO, ESQ.

Transcribed By:

                            BONNIE JOY LEWIS, R.P.R.
                            7001 SW 13 Street
                            Pembroke Pines, FL  33023
                            954-985-8875
                            caselawrptg@gmail.com

1

2                              I N D E X

3     THE WITNESS:                                   PAGE:

4     **HSI SPECIAL AGENT TODD KEY**

5

6     Cross Examination by Mr. Pallas:               32

7     Redirect Examination by Mr. Tamen:             --

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Thereupon, the following proceeding was held:)

2          THE COURTROOM DEPUTY:  United States District Court

3    for the Southern District of Florida is now in session.  The

4    Honorable Jonathan Goodman presiding.

5          Case Number 18-3700-mj-Goodman; Jorge Alberto Perez

6    and Alexey Aguilera.

7          THE COURT:  Good afternoon, folks.  Please be seated

8    and make yourselves comfortable.

9          Good afternoon and let's start off with appearances

10   starting first with the United States.

11         MR. TAMEN:  Good afternoon, Your Honor.  Frank Tamen

12   representing the United States.

13         THE COURT:  And who do you have with you, Mr. Tamen?

14         MR. TAMEN:  Special Agent Todd Key of Homeland

15   Security.

16         THE COURT:  All right.  And Agent Key, are you based

17   in Mississippi?

18         SPECIAL AGENT KEY:  That is correct, sir.

19         THE COURT:  Pull the microphone closer.

20         So welcome to the Southern District of Florida.  Good

21   to meet you, sir.

22         And let's see who is here for the Defense, please.

23         MR. DEFABIO:  Good afternoon, Your Honor.

24         Joel DeFabio for Alexey Aguilera, who is present with

25   the aid of the interpreter.

1          MR. PALLAS:  Good afternoon, Your Honor.

2          George Pallas on behalf of the Defendant Jorge Perez

3  who is also seated next to me.

4          THE COURT:  Very well.

5          So let's find out first if everybody's headphones are

6  working.

7          Mr. Pallas, do I call your client Mr. Alberto or Mr.

8  Perez?

9          MR. PALLAS:  Mr. Perez.

10         THE COURT:  All right.  Mr. Perez, how are the

11  headphones working for you this afternoon, sir?

12         DEFENDANT PEREZ:  (Through interpreter)  Fine.

13         THE COURT:  All right.  And what about you, Mr.

14  Aguilera, how are the headphones working for you?

15         DEFENDANT AGUILERA:  (Through interpreter)  Fine.

16         THE COURT:  So if both of you experience any

17  difficulty hearing or understanding what is being said, let me

18  know immediately because I want to avoid a situation where were

19  you raise your hands and say I don't understand what is

20  happening.  And I say how long has this situation been going on

21  and you say 15 to 20 minutes and that is not a good scenario.

22         You need to tell me right away if you have any

23  difficulty understanding, alright?

24         So I see one head nod from one Defendant.  I need two

25  affirmative responses head nods.

1          Mr. Perez, do you understand?

2          DEFENDANT PEREZ:  Yes.

3          THE COURT:  Okay.  Mr. Aguilera?

4          DEFENDANT AGUILERA:  Yes.

5          THE COURT:  Thank you.

6          So, folks, I have received a memorandum of law from

7   the Government and I have received a memorandum of law from Mr.

8   Pallas.  I haven't received one on behalf of Mr. Aguilera.

9          MR. DEFABIO:  Judge, in regards to Mr. Aguilera, the

10  Government and the Defense have a proposed bond that we have

11  agreed on.

12          THE COURT:  All right.  Let me hear that, then,

13  please.

14          MR. DEFABIO:  Judge, we have agreed to a three-part

15  bond; a $150,000 corporate surety bond to be co-signed by the

16  Defendant's wife, his father-in-law Felix Perez, and his

17  brother Kenient Aguilera, who flew in from Texas.  The second

18  part is a $50,000 ten percent bond and the third is a $25,000

19  corporate surety bond.

20          The funds for both the ten percent bond and the

21  corporate surety bond are being provided by Mr. Perez, Felix

22  Perez the father-in-law.

23          I have provided the Government with copies of the bank

24  statements for the last three months to see where the funds are

25  coming from.  And he has also collateralized the corporate

1   surety bond with his house, home which is located at 12929

2   Southwest 48th Street, Miami, Florida.

3   　　　THE COURT:  So let me just ask a few followup

4   questions and perhaps you misspoke.  I am not sure.

5   　　　You started off by saying that it was a three-part

6   bond and, then, you said the first part was $150,000 corporate

7   surety bond.

8   　　　MR. DEFABIO:  No, a personal surety bond.

9   　　　THE COURT:  After I heard the rest of your statements,

10  I realized that you may have misspoken, but you actually meant

11  personal surety bond.

12  　　　MR. DEFABIO:  Yes, Judge.

13  　　　THE COURT:  To be co-signed by your client's wife,

14  father-in-law, and brother?

15  　　　MR. DEFABIO:  Correct.

16  　　　THE COURT:  And then, a $50,000 ten percent bond.  I

17  assume there is a *Nebbia* requirement, which I believe you

18  demonstrated to Mr. Tamen's satisfaction?

19  　　　MR. DEFABIO:  Yes, Your Honor.

20  　　　THE COURT:  And then, a $25,000 corporate surety bond?

21  　　　MR. DEFABIO:  Correct, Judge.

22  　　　THE COURT:  So did you discuss, with Mr. Tamen, any

23  other conditions of pretrial release other than the amount of

24  the bond and the co-signers?

25  　　　MR. DEFABIO:  We did not go over the conditions.  I

1   would assume that the normal for Pretrial Services travel

2   limited to the Southern District and the District of Southern

3   Mississippi.  And obviously going back and forth and any other

4   requirements the Court or Pretrial requests.

5        THE COURT:  So let's just take it one step at a time.

6   Bear with me just a minute, please.

7        What about surrendering passport and travel documents

8   to Pretrial Services and not seeking or applying for any

9   additional passports or travel documents?

10       MR. DEFABIO:  Judge, he does not have a passport to

11  surrender, which is noted in the Pretrial Services Report, but

12  we don't oppose that request, because it means if he has it, he

13  will surrender, but he will not get any other travel documents.

14       THE COURT:  All right.  And what about employment

15  restrictions?

16       So normally, Mr. DeFabio, in a case like this,

17  typically the release will include a prohibition against

18  working any place where the Defendant has access to credit

19  cards, or access devices, or the personal information of

20  others.

21       Do you have any problems with that employment

22  restriction?

23       MR. DEFABIO:  No, he does not work in that field and

24  we don't have a problem with that restriction.

25       THE COURT:  Any other separate restrictions suggested

```
 1   by the U.S. Attorney's Office, Mr. Tamen?
 2           MR. TAMEN:  This would sound redundant, but he
 3   shouldn't possess or use any credit card or credit card numbers
 4   that are not his own.
 5           THE COURT:  All right.  So if I could have the two
 6   proposed co-signors come to the lectern, Felix Perez and
 7   Kenient Aguilera.
 8           Mr. DeFabio, do these gentlemen need headphones, do
 9   you know?
10           MR. DEFABIO:  Yes.  Mr. Aguilera's brother does.
11           THE COURT:  All right.
12           MR. DEFABIO:  Would you also require the wife?  She is
13   also a co-signor.
14           THE COURT:  Yes.
15           So let's make sure that everybody who needs headphones
16   has headphones.
17           Sir, do you need headphones?
18           MR. F. PEREZ:  No, sir.
19           THE COURT:  And ma'am, do you need headphones?
20           MS. PEREZ:  Yes.
21           THE COURT:  And so, are you hearing and understanding
22   what I am saying with the headphones?
23           MR. AGUILERA:  Yes.
24           MS. PEREZ:  Yes.
25           THE COURT:  Tammy, swear in all three witnesses.
```

1           THE COURTROOM DEPUTY:  Please raise your hands.

2           THE PROPOSED CO-SIGNORS: (Complied.)

3  (Proposed co-signors sworn.)

4           THE COURT:  I am going to be speaking with you one at

5  a time and I am going to being speaking first with Mr.

6  Aguilera's wife.  So if you would come a little closer to the

7  microphone I would appreciate that.  Bear with me just a

8  minute, please.

9           Is everybody hearing and understanding what is being

10 said?

11          THE PROPOSED CO-SIGNORS:  Yes.

12          All right.  Ma'am, tell me your name, please.

13          THE WITNESS:  Jacqueline Perez.

14          THE COURT:  Jacqueline, are you the wife of Mr.

15 Aguilera?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Are you legally married or what is

18 sometimes called a common law wife?

19          Meaning -- let me finish my question.  You are

20 probably going to guess what I am going to say.  I know you are

21 probably nervous.  And just relax, but just let me get my

22 question out which is, are you legally married, or are you

23 involved in a long-term relationship with Mr. Aguilera for so

24 many years that it is sometimes called a common law marriage?

25          MS. PEREZ:  We've been together for nine years and we

1  have a son.

2          THE COURT:  I understand.  All right.  From your

3  perspective you are basically married?

4          MS. PEREZ:  Married.

5          THE COURT:  All right.  I understand.

6          And what type of work do you do, Miss Perez?

7          MS. PEREZ:  I work for University of Miami.

8          THE COURT:  What do you do?

9          MS. PEREZ:  Patient Service Representative.  That's

10  the title.

11          THE COURT:  All right.  So some of these questions I

12  am going to ask you, Miss Perez, are just standard.  I don't

13  mean to insult you at all and I have a pretty good guess on

14  what the answers are to these questions based on your

15  employment, but I am going to ask them anyway.

16          Do you have any kind of criminal record?

17          MS. PEREZ:  No, sir.

18          THE COURT:  Do you have any substance abuse problem?

19          MS. PEREZ:  No, sir.

20          THE COURT:  Where do you live?

21          MS. PEREZ:  2703 Southwest 153rd Place, Miami 33185.

22          THE COURT:  And do you own that home?

23          MS. PEREZ: (Inaudible.)

24          THE COURT:  I'm sorry.  Wait a minute.  Mr. DeFabio,

25  what's going on?

1    MR. DEFABIO:  Judge, I believe she --

2    MS. PEREZ:  2507 Southwest 153rd Place.

3    THE COURT:  I understand.  All right.  That's fine.

4  All right.  So do you own that home?

5    MS. PEREZ:  We rent it.

6    THE COURT:  You rent the home.

7    All right.  And are you willing to be a co-signer on

8  the bond?

9    MS. PEREZ:  Yes, sir.

10    THE COURT:  And do you understand the potential

11  consequences that might arise for being a co-signer on the bond

12  and if you don't that's not a worry.  Just let me know and I

13  will be happy to give you a quick explanation.

14    MS. PEREZ:  I know exactly what that means.  I was

15  here the other day and I completely understand.

16    THE COURT:  Fair enough.

17    Mr. Tamen, do you have any questions you would like to

18  ask Miss Perez?

19    MR. TAMEN:  No, Your Honor.

20    THE COURT:  All right.  Thank you, ma'am.  I

21  appreciate it.  And if you would step to the side and let's

22  hear from Felix Perez.

23    Sir, tell me your full name and date of birth.

24    MR. F. PEREZ:  Felix Perez; 01/26 1956.

25    THE COURT:  Do you work, Mr. Perez?

```
 1              MR. F. PEREZ:  Yes.
 2              THE COURT:  What type of work do you do?
 3              MR. F. PEREZ:  I do low voltage communication.
 4              THE COURT:  What does that mean?  I mean, what type of
 5    products are involved in low voltage communication?
 6              MR. F. PEREZ:  Install cable networks and do some WIFI
 7    and stuff like that.
 8              THE COURT:  Do you have your own company or do you
 9    work for another company?
10              MR. F. PEREZ:  I have my own company and I qualify
11    another company, too.
12              THE COURT:  Do you have any kind of criminal record?
13              MR. F. PEREZ:  No, sir.
14              THE COURT:  Do you own your own home?
15              MR. F. PEREZ:  Yes, sir.
16              THE COURT:  Where?
17              MR. F. PEREZ:  12929 --
18              THE COURT:  Wait.  12929 Southwest --
19              MR. F. PEREZ:  48th Street.
20              THE COURT:  48th Street.
21              MR. F. PEREZ:  33175.
22              THE COURT:  And who else lives there at that home
23    besides you?
24              MR. F. PEREZ:  My wife.
25              THE COURT:  Anybody else?
```

```
 1          MR. F. PEREZ:  No.

 2          THE COURT:  More or less, how much equity do you have

 3  in that home?

 4          MR. F. PEREZ:  $25,000 or $30,000.

 5          THE COURT:  I may have asked you this before, but if I

 6  did, I apologize.  Do you have any kind of criminal record?

 7          MR. F. PEREZ:  No, sir.

 8          THE COURT:  Are you willing to be a co-signer on a

 9  bond?

10          MR. F. PEREZ:  Yes, sir.

11          THE COURT:  Mr. Tamen, do you have any questions you

12  would like to ask Felix Perez?

13          MR. TAMEN:  No, Your Honor.

14          THE COURT:  All right.  Thank you very much.

15          And now, let's talk with Kenient Aguilera.  If you

16  would come to the lectern, sir.

17          Tell me your full name and date of birth, please.

18          MR. AGUILERA (through Spanish interpreter):

19          Kenient Aguilera; April 2nd, 1977.

20          THE COURT:  And tell me your date of birth, sir.  I'm

21  sorry.  I misspoke.

22          What kind of work do you do?

23          MR. AGUILERA:  I transport materials.  I have my own

24  company.

25          THE COURT:  You live in Houston?
```

1          MR. AGUILERA:  Correct.

2          THE COURT:  Do you own any real estate?

3          MR. AGUILERA:  Not real estate, but equipment that I

4  have, the trucks.  It's all of them.

5          THE COURT:  Do you have any kind of criminal record?

6          MR. AGUILERA:  No.

7          THE COURT:  Are you willing to be a co-signer on a

8  bond?

9          MR. AGUILERA:  Yes.

10          THE COURT:  Mr. Tamen, do you have any questions you

11  would like to ask Mr. Aguilera?

12          MR. TAMEN:  No, Your Honor.

13          THE COURT:  Thank you very much.  Any other special

14  conditions from Pretrial Services?

15          THE PROBATION:  No, Judge.  Thank you.

16          THE COURT:  So, concerning Mr. Alexey Aguilera, this

17  will be a three-part bond.

18          Tammy, if I speak too quickly or I am getting a bit

19  too detailed, just let me know and I will repeat it, okay.

20          THE COURTROOM DEPUTY:  Okay.

21          THE COURT:  So this will be a $150,000 personal surety

22  bond to be co-signed by the Defendant's common law wife,

23  Jacquelyn Perez; also to be co-signed by his father-in-law,

24  Felix Perez; and co-signed by his brother, Kenient Aguilera.

25          The second bond will be a $50,000 ten percent bond

1  with a *Nebbia* requirement.  And Mr. DeFabio, I have a *Nebbia*

2  form that I use.  It is on the bench in front of me.  You may

3  be familiar with it.

4        You are?  Then I don't need to explain further.

5        And then, there will be a $25,000 corporate surety

6  bond.  Any of the co-signors who own real estate will not be

7  able to sell, or transfer, or convey, or do anything at all to

8  affect the title to the real estate.

9        In addition, Mr. Aguilera will need to surrender his

10  passports and travel documents to Pretrial Services.  I know,

11  Mr. DeFabio, you told me that he does not have any, but the

12  other part of this condition is that he may not seek or apply

13  for any additional passports or travel documents.

14        He will need to report to Pretrial Services as

15  directed.  He may not work any place where he has access to

16  credit cards, access devices, or the personal identifying

17  information of others;

18        He may not possess any credit card or credit card

19  numbers other than his own;

20        And travel will be restricted through the Southern

21  District of Florida and Mississippi for required court

22  appearances.

23        So, now, let me just make one other comment .  Mr.

24  DeFabio, the *Nebbia* form, you are going to need me to co-sign

25  it.  So after we are done with the hearing today, you and Mr.

1  Tamen will quickly fill out that form if you haven't already

2  done so, but I will need to sign it before Tammy signs -- what

3  we call in the business, the slip, which authorizes the Marshal

4  Service to release your client.  The *Nebbia* form is succinct

5  and it shouldn't take you more than a minute or two to prepare

6  it.

7             And I assume that all of these arrangements, Mr.

8  Tamen, have been coordinated with and approved by your

9  colleagues in the District of Mississippi?

10            MR. TAMEN:  Yes, Your Honor, they have.

11            THE COURT:  All right.  Fair enough.

12            And so, now, let's talk about the removal.  Mr.

13  DeFabio, I am assuming -- I don't know for sure, but I am

14  assuming that your client is going to waive his right to a

15  removal hearing or an identity hearing?

16            MR. DEFABIO:  That is correct, Judge.

17            THE COURT:  Has he signed the appropriate form?

18            MR. DEFABIO:  He will do so now.

19            THE COURT:  Okay.  No access to credit cards, or

20  credit card devices, or the personal identification information

21  of others.

22            Tammy, I think Mr. DeFabio is handing you up a form.

23            THE COURTROOM DEPUTY:  Oh, sorry.

24            THE COURT:  All right.  Tammy, let me return these to

25  you.

1        Mr. DeFabio, that means that your client is going to

2   be making his own arrangements to get himself to Mississippi to

3   address the charges there?

4        MR. DEFABIO:  Yes, sir.

5        THE COURT:  So I am basically going to give you, Mr.

6   DeFabio, an additional homework assignment and I am going to be

7   designating you as the quarterback or *consiglieri* to shepherd

8   your client through this process to make sure that he knows

9   exactly where he needs to go in Mississippi, what day he needs

10  to be there, what time he needs to be there, the courtroom

11  number.

12       All the information because over the years I have had

13  a few situations where people have agreed to removal and then

14  they don't know when they are supposed to show up and then what

15  happens is Murphy's Law kicks in and they show up late.

16       By that time, there is already an arrest warrant and

17  it turns out to be a big mess.  And I largely blame the lawyers

18  for that because they don't give their clients or client timely

19  information.

20       But I know you for many years and I know you are not

21  going to let that happen and you are especially not going to

22  let that happen now I gave you the homework assignment.

23       MR. DEFABIO:  Yes, Judge.

24       THE COURT:  All right.  And on an unrelated matter,

25  just to show you that I do pay attention at times, how did the

1  real estate closing go?

2         MR. DEFABIO:  Oh, it went great.  Thank you.

3         THE COURT:  So you are now a guarantor.

4  Congratulations to you.

5         MR. DEFABIO:  Like you said, you are never away from

6  being a guarantor for your children.

7         THE COURT:  Something like that.  That's right.

8         All right.  So anything further from either side this

9  afternoon concerning Mr. Aguilera?

10        MR. DEFABIO:  No, Your Honor.

11        MR. TAMEN:  No, sir.

12        THE COURT:  And so, now, we are going to get to Mr.

13 Jorge Alberto Perez.  And I am assuming that we have an agent

14 from Mississippi that Mr. Tamen, you have not worked out an

15 arrangement with the Defense counsel and we need to have an

16 actual pretrial hearing.

17        MR. TAMEN:  That's correct, Your Honor.

18        MR. DEFABIO:  I'm sorry.

19        The Marshals are going to take Mr. Aguilera away.  Can

20 he witness or get through this hearing.  I think it would be

21 helpful for future court decisions, so to speak.

22        THE COURT:  Let's find out Mr. Tamen's position.

23        MR. TAMEN:  That's fine with me.

24        THE COURT:  So I don't want to do anything that is

25 going to interfere with the Marshals' security arrangements.  I

```
 1  don't want to throw a monkey wrench into how they handle
 2  things.
 3         Gentlemen, is it a problem if this man remains here
 4  until the rest of the hearing is over?
 5         THE MARSHALS:  No, Your Honor.  That's fine.
 6         THE COURT:  Okay.  Very well.  Thank you.
 7         All right.  So before we get to talking about Mr.
 8  Perez, we are going to take a little bit of a stroll and we are
 9  going to return to law school.
10         And we are going to take a look at the Bail Reform Act
11  and see whether or not the grounds that the Government is
12  relying on are all applicable, but before that, let me just
13  make sure that I understand the Government's position.
14         Mr. Tamen, as I understand it, you are seeking to
15  detain Mr. Perez both on risk of flight and danger to the
16  community; am I right?
17         MR. TAMEN:  That is correct, Your Honor.
18         THE COURT:  Okay.  So do you have your statute handy?
19         MR. TAMEN:  I didn't bring a copy of it with me, but I
20  did read it a couple of times in preparation for this hearing.
21         THE COURT:  That's not going to work because we are
22  going to get really into the weeds here.
23         So, Mr. DeFabio, you probably don't have your Federal
24  Rule book here because you worked something out with the
25  Government.
```

1              Okay.  So here is what we are going to do.  We are

2    going to take a two-minute break.  Tammy, here is a copy of the

3    Bail Reform Act.  If you would make a copy and give it to Mr.

4    Tamen and then return it to me.  And then, we are going to go

5    through the provisions, Mr. Tamen, and you and I will see

6    whether or not you are going to be able to invoke danger to the

7    community.  Okay.  Pretty exciting, huh?

8              And Mr. Pallas, do you have your copy of the Bail

9    Reform Act handy or do you need a copy, too?

10             MR. PALLAS:  I don't have a copy.

11             THE COURT:  Gosh, would you go in the back?  Can you

12   get to my chambers?  You know, I am going to -- do me a favor.

13   Tammy is in the copy room making a copy of the Bail Reform Act.

14   Can you ask her to actually make two copies because it appears

15   that both lawyers did not bring their rule book here.  Okay.

16   Thank you.

17             So, Agent, what city is the major city in the Southern

18   District of Mississippi?

19             SPECIAL AGENT KEY:  Gulfport Biloxi, Your Honor.

20             THE COURT:  Do they still have gambling boats down

21   there?

22             SPECIAL AGENT KEY:  Yes, Your Honor.

23             THE COURT:  Are they like docked right next to the

24   shore or do they actually have to leave and go out onto the

25   water to have gambling operations?

1        SPECIAL AGENT KEY:  They're on land.

2        THE COURT:  They are on land?

3        SPECIAL AGENT KEY:  After Hurricane Katrina.  They

4   were voted in to have them put on land.

5        THE COURT:  I see.  Thank you for that information.

6        All right, folks, so let's turn, if we can, please, to

7   Page 4 and focus your attention on Subsection E, detention --

8   I'm sorry.  Page 5, detention hearing.

9        Is everybody there?

10        MR. PALLAS:  Yes.

11        THE COURT:  So we go to F-1.  Let's take it one

12   category at a time.  Mr. Tamen, focusing on Category A, is the

13   charged offense a crime of violence?

14        MR. TAMEN:  No, it is not.

15        THE COURT:  Okay.  Number B, is it an offense for

16   which the maximum offense is life imprisonment or death?

17        MR. TAMEN:  No.

18        THE COURT:  Let's go to number C.  Is this an offense

19   under the Controlled Substances Act?

20        MR. TAMEN:  No.

21        THE COURT:  Let's go to number D.

22        Any felony, which would be this case, any felony if

23   the person, Mr. Perez, has been convicted of two or more

24   offenses described in Subparagraphs A through C, the ones that

25   we just talked about, or two or more state or local offenses

1   that would have been offenses in Subparagraphs A through C.

2          Does Mr. Perez qualify under Paragraph D?

3          MR. TAMEN:  Yes, he does.

4          THE COURT:  Tell me why.

5          MR. TAMEN:  He has two prior convictions in the State

6   of Florida; one for cocaine trafficking and one for strong

7   armed robbery.

8          THE COURT:  All right.  Fair enough.  So that is the

9   answer.  And then, of course, on Paragraph 2, Subparagraph A, a

10   serious risk of flight, correct?

11          MR. TAMEN:  Yes.

12          THE COURT:  And then, when we are looking at either of

13   those, including a serious risk of flight under Category G,

14   factors to be considered, we can consider under Category 4, the

15   nature and seriousness of the danger to any person or the

16   community that will be posed by the person's release.

17          Phrased differently, even when we are analyzing risk

18   of flight, we can factor in danger to the person or community.

19          Do you agree with that, Mr. Tamen?

20          MR. TAMEN:  Yes, Your Honor.

21          THE COURT:  Okay.  Counsel, do you agree?

22          MR. PALLAS:  Judge, I don't agree with the assertion

23   that there are two or more qualifying offenses.

24          THE COURT:  I was just about to ask you that.  So tell

25   me about that, please.

1          MR. PALLAS:  Okay.  There is a trafficking offense, a

2    state trafficking offense which would qualify.

3          THE COURT:  All right.

4          MR. PALLAS:  But the strong armed robbery would not

5    because it is not an offense within A and C, which would give

6    rise to federal jurisdiction or -- in other words, it would not

7    be a federal offense.

8          THE COURT:  So you are saying that strong armed

9    robbery is not a crime of violence where there is a maximum

10   term of imprisonment of ten years or more?

11         MR. PALLAS:  Correct.

12         THE COURT:  Mr. Tamen, what about that?

13         Explain to me why you think the prior strong armed

14   robbery fits in A, or B, or C?

15         MR. TAMEN:  It has been a long time since I was a

16   state prosecutor, but I don't think the law on strong armed

17   robbery has changed since then.  It's a second degree felony

18   punishable by a maximum of 15 years of imprisonment.

19         And there is a body of federal case law principally

20   under the Armed Career Act that holds that strong armed robbery

21   is, indeed, a federal crime of violence, or a crime of violence

22   when it is part of the criminal history being considered for

23   federal statutes that impose minimum sentences.

24         So I think that that clearly applies, but even if the

25   Government is not authorized, or if the Court were to find that

1  the Government is not authorized to ask for pretrial detention

2  on the basis of danger to the community, the Court nonetheless

3  is required to consider that factor in its analysis.

4        So either way the Court has to look at whether this

5  Defendant poses a danger to the community.

6        THE COURT:  Understood.

7        So let me just ask Pretrial Services.  I don't know if

8  you were prepared to be quizzed today on the nuances of the

9  law, but under the prior conviction of strong armed robbery

10  here in state court, is it your view that that is a crime of

11  violence which fits into category --

12        THE PROBATION:  Judge, I would have to consult with my

13  office with a supervisor from our PSI Unit to give you an

14  accurate answer.  I could certainly do that if the Court would

15  like me to do that.

16        THE COURT:  So is that the kind of thing you could do

17  now by text message and get an answer while we are here in

18  court?

19        THE PROBATION:  I could certainly try.  Yes, Judge.

20        THE COURT:  Okay.

21        THE PROBATION:  So the question would be if you

22  consider the charge of strong armed robbery a crime of

23  violence?

24        THE COURT:  No.

25        THE PROBATION:  Okay.

1        THE COURT:  It is not a charge.  It is a conviction.

2   Whether a conviction of strong armed robbery would constitute a

3   crime of violence under Section F, as in Frank, 1 capital A of

4   the Bail Reform Act.

5        THE PROBATION:  Okay.  Judge, I will send the e-mail

6   right away.

7        THE COURT:  And Mr. Pallas, do you have any case law

8   to suggest that a strong armed robbery would not be a

9   qualifying offense under F1A?

10        MR. PALLAS:  I do not, Judge, but just to further go

11   down this law school exam type issue, it was actually a

12   withhold of adjudication as well.

13        And I know at times that is considered to be a

14   conviction and at other times it is not.  It was a withheld of

15   adjudication -- according to the Pretrial Services Report, it

16   was a withhold of adjudication, nolo plea withhold of

17   adjudication, one year probation that was terminated early.

18        THE COURT:  So what about that, Mr. Tamen?

19        MR. TAMEN:  I don't see where it says nolo plea under

20   the Pretrial Services Report.  Nonetheless, the Court has to

21   accept that there is a factual basis for believing the

22   Defendant committed the crime and impose a sentence.

23        And under the Florida Sentencing Guidelines, at least

24   when I was last familiar with them, when they compute your

25   criminal history if you have a withheld of adjudication on a

1    prior felony that counts as a conviction for Florida's

2    Sentencing Guidelines felony records.

3            So, but as I said, the better course of action, rather

4    than belabor the point is for the Court to consider that since

5    it has to consider the issue of potential safety of the

6    community, whether I ask for detention on that basis

7    specifically or just restrict my request to risk of flight.

8            And I am prepared to go forward with the facts

9    relating to risk of flight and, then, also provide background

10   for the Court to analyze that fact.

11           THE COURT:  Sure.  I am happy to hear your proffer and

12   then we will have your agent take the stand.

13           MR. TAMEN:  Judge, this case occurred principally on

14   February 17th of 2018 in Gulfport, Mississippi.

15           In essence, both this Defendant and his co-Defendant

16   Mr. Aguilera got caught red-handed in the midst of using

17   fraudulent credit cards.

18           What happened was that approximately two weeks earlier

19   two men had come into a CVS store in Gulfport and used credit

20   cards at an ATM machine there.  The banks involved notified the

21   CVS store that there was fraudulent activity on the ATM machine

22   in that store, which the clerks were apprised of as well.

23           Approximately two weeks later on the 17th, the two

24   Defendants came to this store.  First, Mr. Perez came in and

25   accessed the ATM machine with a credit card and left and, then,

1   Mr. Aguilera came in and did the same thing.

2        It was the same clerk who had been on duty two weeks

3   previously who recognized them as having been the people who

4   were in the store before and used fraudulent credit cards.

5        So she called the police and said there are two men

6   who are using fraudulent credit cards in my store that they

7   were doing two weeks ago also.

8        The police arrived and Mr. Aguilera is at the ATM

9   machine with a credit card that did not belong to him using it.

10  They then went outside where his vehicle was parked and there

11  was Mr. Perez sitting in the vehicle.

12       The ATM machine had a video in it.  And subsequently,

13  during the course of the investigation, the video was pulled

14  and it showed this Defendant, Mr. Perez, and the co-Defendant

15  Mr. Aguilera at the ATM machine using fraudulently obtained

16  credit cards.

17       Mr. Perez was outside in his vehicle when the police

18  arrived and they approached him.  He gave consent to search the

19  vehicle.  What they found inside the vehicle was a -- what I

20  would describe as a credit card manufacturing device.

21       It's a small handheld device which, if programmed with

22  credit card information such as account numbers and other

23  information, will emboss that information onto a piece of

24  plastic and basically make a credit card.  And that is used

25  obviously not by banks, but by people who have fraudulently

1  obtained other people's credit card numbers to manufacture

2  fraudulent credit cards.

3         So there the Defendant was found in possession of the

4  device with unlimited capacity to make fraudulent credit cards.

5  They also found within the vehicle a laptop computer, which

6  they were able to access and they found 518 credit card numbers

7  listed with personal account information in it all of them

8  belonging to other people.

9         They were actual credit card accounts with actual

10 victims.  They were not just numbers that had been made up to

11 defraud a bank.  They were other people's credit card numbers,

12 including their personal information such as dates of birth.

13        They were able to determine that $14,800 had been

14 obtained fraudulently by using some of those credit card

15 numbers.  Those credit card numbers came from multiple banks.

16        Meaning, it wasn't like one place they were getting

17 the credit card numbers from.  That this was a large scale

18 operation.  Different banks and different parts of the

19 southeastern United States different credit cards had all been

20 obtained fraudulently belonging to other people.

21        And Mr. Perez had three fraudulent credit cards in his

22 pocket at the time.  He also had multiple cell phones in his

23 possession.

24        Interestingly enough, Mr. Perez put in a

25 administrative claim for the computer with all of that

1  fraudulent credit card information in it when the Government

2  sought to seize it.

3          Although the losses are -- oh, excuse me.  I misspoke

4  before.  He had $14,800 in U.S. currency on him when he was

5  arrested in his vehicle.  The losses from the credit cards that

6  were counted up so far were $10,319, but some of those credit

7  cards had already been flagged as being stolen so the account

8  numbers were shut down.

9          The potential for credit card fraud with 518 credit

10  card numbers, even if you consider a round number of $500 per

11  card, there was a potential for a quarter of a million dollars

12  worth of fraud to be committed from the numbers that the

13  Defendant had in his possession.

14          Some of the charges in the indictment carry two-year

15  mandatory sentences.  So the Defendant is looking at a two-year

16  sentence.  Plus whatever sentence would be imposed pursuant to

17  the guidelines.  If it is based on the actual fraud, it would

18  probably be a sentence in the range of two and-a-half to three

19  and-a-half years, but if it is based on a potential fraud it

20  could be much larger than that.

21          In addition, Mr. Perez has found to have been wanted

22  by the State of Louisiana.  There is an active felony warrant

23  for his arrest and it is the same exact sort of offense and the

24  same *modus operandi* that was committed in the town of Kenner,

25  Louisiana that has been charged in Gulfport, Mississippi.

1          Police also found that the truck that they were

2    driving in Gulfport had been rented the day before at Miami

3    International Airport.  Those are the basic facts of the case,

4    Your Honor.

5          THE COURT:  So, Mr. Tamen, based on Mr. Perez' prior

6    criminal history and the facts of the indicted case, what would

7    be his exposure under the advisory sentencing guidelines?

8          I heard you say two and-a-half to three years, but

9    does that factor in the criminal history?

10          MR. TAMEN:  It is two and-a-half to three and-a-half

11    years.

12          No, I didn't count for the criminal history because

13    the age of the charges, they would probably not score points

14    under the guidelines, but they clearly would be grounds for a

15    departure on the grounds of his criminal history not being

16    adequately represented.

17          So, in that area, we would be left with speculation as

18    to what the Judge would tend to think of somebody with his

19    history.

20          THE COURT:  So please have your agent come to the

21    stand.

22          THE COURTROOM DEPUTY:  Raise your right hand.

23          THE WITNESS:  (Complied.)

24    (Witness sworn.)

25          THE COURT:  Please state your name for the record and

1  spell the last name slowly, please.

2          THE WITNESS:  My name is Todd Key; K-E-Y.

3          THE COURT:  Sir, you may come to the lectern and

4  inquire if you would like.

5          MR. PALLAS:  Thank you, Your Honor.

6          SPECIAL AGENT TODD KEY, GOVERNMENT'S WITNESS SWORN

7                        CROSS EXAMINATION

8  BY MR. PALLAS:

9  Q.   I'm sorry.  I didn't get the spelling of your last name.

10  A.   **Key; K-E-Y.**

11  Q.   K-E-Y.  Oh, okay.

12      Sir, were you present in Gulfport on February 17th?

13  A.   **I was not.**

14  Q.   Okay.  So did you have any involvement in the initial

15  stages of the case?

16  A.   **On February -- on the following Monday, I got involved with**

17  **the investigation at that point.**

18  Q.   Okay.  So it was several days or a week later?

19  A.   **Two days later.**

20  Q.   Two days later.

21      Okay.  And by that time where was Mr. Perez?

22  A.   **He was released on -- he was released that night, that**

23  **evening on the 17th.**

24  Q.   Was he arrested by state authorities?

25  A.   **No.  No, he was not.**

1  Q.   The state authorities were the ones that arrived at the

2  location?

3  A.   **That is correct.**

4  Q.   I mean, as far as you know?

5  A.   **That is correct.   It's my understanding that they arrived.**

6  **They took the initial report and then contacted us.**

7  Q.   Okay.

8  A.   **Contacted Homeland Security Investigation.**

9  Q.   And they were the ones that the seized the computer and the

10  phones and the currency?

11  A.   **Homeland Security Investigation seized the computer, the**

12  **phones, and the currency.**

13  Q.   Was Homeland Security present on the 17th?

14  A.   **During the interviews.**

15  Q.   Okay.   So there was a representative of Homeland Security

16  present on the 17th, but it wasn't you?

17  A.   **That is correct.**

18  Q.   Okay.   Who was it?

19  A.   **It was Agent Holicrantz (phonetic).**

20  Q.   Okay.   And so that agent seized that equipment and the

21  currency?

22  A.   **That is correct.**

23  Q.   Okay.   And now, when law enforcement arrived at CVS, who

24  was it that was at the ATM?

25  A.   **Mr. Aguilera was inside the business.**

1  Q.   Okay.  And Mr. Perez was in the vehicle?

2  A.   **That's my understanding, yes.**

3  Q.   And you are saying or the proffer was that there was a

4  consent to search the vehicle?

5  A.   **That is correct.**

6  Q.   Is that a written consent?

7  A.   **I believe it was -- I believe it was a written consent.  I**

8  **could refer back to the file.**

9  Q.   Do you have your file?

10  A.   **I do.**

11        MR. PALLAS:   Judge, can he refer to that?

12        THE COURT:   Yes.

13  A.   **It was verbal consent.**

14  BY MR. PALLAS:

15  Q.   At the interview, you were not present for the interview

16  and it was Special Agent Holicrantz?

17  A.   **That is correct and I believe they both invoked.**

18  Q.   Okay.  So there was no interview?

19  A.   **Not to my understanding.**

20  Q.   All right.  But you did have Mr. Perez' information,

21  correct?

22  A.   **That is correct.**

23  Q.   I mean, he had to give you --

24  A.   **He had to provide that to the officers on the scene.**

25  Q.   So if he gave his correct name and correct address, didn't

1   he?

2   A.   **To my understanding, yes.**

3   Q.   And Homeland Security kept the equipment and the money.

4        And in fact, some time later, I believe it was April of

5   that year, sent him a letter saying, hey, if you want to make a

6   claim for the money, or the computer, or the phone, you could

7   do that, correct?

8   A.   **That is correct.  I'm not positive on the date, but that's**

9   **normal procedure for the administrative forfeiture process.**

10  Q.   And it was administrative at this point?

11  A.   **That is correct.**

12  Q.   And when did you consult with the U.S. Attorney's Office in

13  the Southern District of Mississippi regarding a possible

14  criminal referral?

15  A.   **Approximately a month after I knew what I had.**

16  Q.   Okay.

17  A.   **In the criminal investigation.**

18  Q.   Okay.  And what did you know a month or so later that you

19  didn't know prior to that?

20  A.   **I did know that the credit cards that were in Mr. Perez'**

21  **possession, they were fraudulent credit cards.  They had a --**

22  **the three of the credit cards had a certain information on the**

23  **front and on the swipe on the back was totally different**

24  **information.**

25  Q.   Okay.

1  A.   **So I knew that they were fraudulent.**

2  Q.   I mean, you knew that pretty quickly, didn't you?

3  A.   **That's correct.**

4  Q.   But, again, why was the basis, why did you wait a month or

5  so afterwards to even speak to a U.S. Attorney about this case?

6  A.   **I was gathering information to collect for the search**

7  **warrant that I got in April.**

8  Q.   Okay.

9  A.   **For the devices, electronic devices.**

10 Q.   Okay.  And so when did you apply for that search warrant?

11 A.   **I received it on April the 13th, if I am not mistaken.**

12 Q.   And at that time, Mr. Perez had already made a claim for

13 those items, correct?

14 A.   **I don't know when he made his claim.**

15 Q.   You don't have that part as part of your file?

16 A.   **I do not.**

17 Q.   Why would that be?

18           MR. TAMEN:  Objection to relevance.

19           THE COURT:  Overruled.

20 BY MR. PALLAS:

21 Q.   You can answer.

22 A.   **It's part of the administrative process with our uniform**

23 **side and I don't have that information when he applied for his**

24 **-- responded to the admin process, admin forfeiture process.**

25 Q.   So he did reply to that?

1  A.  **I don't have that information.  You said it.**

2  Q.  Well, Mr. Tamen said it also?

3  A.  **I don't have that information.**

4  Q.  Okay.  And but it went to the correct address that Mr.

5  Perez gave you, correct?

6  A.  **I don't know what address it went to.**

7  Q.  Do you know what address Mr. Perez lives at?

8  A.  **I do not.**

9  Q.  You don't even have that in your file?

10 A.  **I have it in the file, yes.**

11 Q.  Did you ever verify that that's the home that he owns and

12 lives at?

13 A.  **Did I -- say that again.**

14 Q.  Did you ever verify that he owns that home and he lives at

15 the home at the address that he gave the Gulfport Police on

16 February 17th?

17 A.  **I looked in the -- I looked his information up in an open**

18 **source database known as CLEAR and that's how I got his**

19 **information of where he lived.**

20         THE COURT:  Excuse me one minute, sir.

21         This is a question for the Marshals.  To me it looks

22 like the sun is coming right in the side and it is shining on

23 your face and you are squinting.

24         Would somebody just close those curtains.  Otherwise

25 it is going to be an uncomfortable hearing for you.  Okay.

 1  There you go.

 2          Please continue, sir.

 3          MR. PALLAS:  Yes.

 4  BY MR. PALLAS:

 5  Q.   But you did verify that was his address, correct, through

 6  this CLEAR database?

 7  A.   **Yes.**

 8  Q.   And when was the indictment issued or --

 9  A.   **In July of 2018.**

10  Q.   Okay.  And what attempt was made to arrest Mr. Perez in

11  July of 2018?

12  A.   **Through our normal collateral investigation process, we**

13  **have to write up an investigation and send it to our sister**

14  **office here in Miami.  And whenever they locate whoever that is**

15  **how it is handled.**

16  Q.   Okay.  So you are not involved in the locating of the

17  indictee?

18  A.   **I was not.**

19  Q.   Okay.  Do you know when you sent that request?

20  A.   **It would have been around August; late August, mid-August.**

21  Q.   And do you have any information on the case in Kenner,

22  Louisiana?

23  A.   **Say that one more time.**

24  Q.   Do you have any information or the allegation in Kenner,

25  Louisiana?

1    A.   **I do.**

2    Q.   Okay.  And what information do you have about that?

3    A.   **It's my understanding that in late 2016, they identified**

4    **Mr. Perez as the same person that had used a credit card in, I**

5    **believe it was another CVS, without looking at the file, but**

6    **one credit card number $403.**

7    Q.   Okay.  And do you know what type of offense that is in

8    Kenner, Louisiana?

9    A.   **It's a felony.**

10   Q.   A felony theft case?

11   A.   **That is correct.**

12   Q.   And it's one count of the $403?

13   A.   **One count.**

14   Q.   And of course, there were no weapons involved in this case,

15   correct?

16   A.   **Not to my knowledge.**

17   Q.   Okay.  No violence?

18   A.   **Not to my knowledge.**

19   Q.   No threats?

20   A.   **No.**

21   Q.   No attempt to flee when the police arrived?

22   A.   **No.**

23        MR. PALLAS:  I have nothing further, Your Honor.

24        THE COURT:  Mr. Tamen, do you have anything further

25   you would like to bring out through your agent?

1    MR. TAMEN:  No, Your Honor.

2    THE COURT:  All right.  Sir, you may step down.  Thank

3  you very much.

4    And so before I entertain argument, let me just ask

5  Defense counsel, what kind of bond are you proposing?  What are

6  the suggested terms of your client's release?

7    MR. PALLAS:  Judge, I would suggest some type of

8  three-part bond that the co-Defendant received.

9    Mr. Perez is a long-time homeowner here in this

10  county.  His home is valued at, by Pretrial Services, in excess

11  of $400,000 and he only owes I believe $170,000 on it.

12    In addition, he owns a company that he has owned for,

13  I believe, like 14, 15 years.  It's a transportation company

14  where he employs -- he employs eight to ten employees.  And he

15  also owns, I believe, six or seven vehicles, transport

16  vehicles.  Some of them are quite expensive, $60,000, $70,000.

17    Although his immigration status has been disturbed

18  because of that felony trafficking case that occurred in the

19  '80s when he was very young -- I mean, it is over 35 years old

20  -- 35 years old, the offense.

21    He has not been able to resolve his immigration

22  situation, but he is permitted to work and he has worked and he

23  owns his company.  He is in a long-term stable relationship

24  with his common law wife.  I believe that is a 17-year

25  relationship.

1          Your Honor knows and met the son who lives in North

2   Carolina.  There are two sons; American citizen sons.  You

3   know, a large personal surety bond.  I think also a corporate

4   surety bond and also a ten percent bond.

5          And Judge, it really in a sense, it really makes sense

6   that, you know, he is not going to be released to the street.

7   He is going to be sent to Kenner.  I mean, all these legal

8   issues have to be resolved.  And he is going to go up there and

9   we will post bond there and will go to Mississippi and take

10  care of the case and we will work it all out.

11          THE COURT:  And who do you propose as co-signors in

12  addition to his son in North Carolina?

13          MR. PALLAS:  I would propose the common law wife, as

14  well as her brother is present as well and they could both

15  sign.  I believe she is a co-owner of the business, but I think

16  he is also co-owner of the property.

17          THE COURT:  Well, that is what the Pretrial Services

18  Report says.

19          MR. PALLAS:  Yes, she also owns the property.

20          THE COURT:  And who do you have present in court today

21  on behalf of your client?

22          MR. PALLAS:  Judge, we have the mother, father -- or

23  no, I don't think we have the mother or father.  We had the

24  mother and father last week.

25          THE COURT:  I have an idea, everybody who is a

1  proposed co-signor, please come to the lectern, all of you.

2  And if anybody needs headphones to understand fully what is

3  happening, please arrange to get them.

4          Sir, I don't think you need to hold the headphones in

5  front of your face.  No, no, put them in your ears.  My point

6  is you don't need to handle them in your hand.

7          So it looks like the two people there are wearing

8  headphones.  Can both of you understand what I am saying with

9  the help of the interpreter?  If so, please answer yes.

10         THE PROPOSED CO-SIGNORS:  Yes.

11         THE COURT:  Is there a third person with headphones?

12         They are blocking each other.  I cannot see who is

13  here.  All right.  We have four people with headphones and one

14  without?

15         MR. PALLAS:  Yes, sir.

16         THE COURT:  And could I hear from the two, I am

17  guessing, the parents?

18         Are you able to understand what I am saying?  Both of

19  you are nodding your heads and saying yes.

20         All right.  So, Tammy, please swear in all five

21  witnesses.

22         THE COURTROOM DEPUTY:  Please raise your right hands.

23         THE PROPOSED CO-SIGNORS:  (Complied.)

24         THE COURT:  As you previously saw from the other

25  hearing, I am going to question each of you one at a time.

1              Let's start off first with the gentleman in the blue

2  collared shirt who is not wearing any headphones.

3              Good afternoon, sir.

4              MR. NARANJO:  Hi, good afternoon, sir.  I'm

5  son-in-law.

6              THE COURT:  So let's just take it a step at a time.

7  First, your actual name.

8              MR. NARANJO:  I'm sorry about that.  That would be

9  Ernesto Naranjo; N-A-R-A-N-J-O.

10             THE COURT:  Ernesto Naranjo?

11             MR. NARANJO:  N-A-R-A-N-J-O.

12             THE COURT:  And your date of birth, sir?

13             MR. NARANJO:  April 6, 1982.

14             THE COURT:  And so you are Mr. Perez' son-in-law?

15             MR. NARANJO:  Yes.  I've been married to his daughter

16  for almost 20 years.  I know him for like 18 years.

17             THE COURT:  All right.

18             MR. NARANJO:  He's the grandfather of my children,

19  yes.

20             THE COURT:  And where do you live, sir?

21             MR. NARANJO:  I live at 16232 Southwest 55 Terrace.

22             THE COURT:  Is that a house?

23             MR. NARANJO:  Yes, I own it.

24             THE COURT:  You own the house?

25             MR. NARANJO:  Yes, sir.

1       THE COURT:  And how much equity do you have in the

2   house?

3       MR. NARANJO:  I would say about $45,000.

4       THE COURT:  Who else lives there with you?

5       MR. NARANJO:  My wife and my two kids.

6       THE COURT:  What type of work do you do?

7       MR. NARANJO:  I'm a nurse case manager.

8       THE COURT:  Where do you work?

9       MR. NARANJO:  Doctor's Healthcare Plan health

10  insurance.

11      THE COURT:  Do you have any kind of criminal record?

12      MR. NARANJO:  No, sir.

13      THE COURT:  Are you willing to be a co-signer on the

14  bond?

15      MR. NARANJO:  Yes.

16      THE COURT:  Are you aware of the potential

17  consequences that might arise from being a co-signer on a bond

18  if Mr. Perez does not appear, as required, in court?

19      MR. NARANJO:  Yes, sir.

20      THE COURT:  Mr. Tamen, do you have any questions to

21  ask Mr. Naranjo?

22      MR. TAMEN:  No, Your Honor.

23      THE COURT:  Thank you.

24      And let's talk next to the woman in the tan dress with

25  the black shirt underneath.

1    MS. PEREZ:  Good afternoon, ma'am.

2    Come a little closer to the microphone please and

3  speak a little louder, please.  Tell me your full name and date

4  of birth.

5    MS. PEREZ:  (Through Spanish interpreter)  Zuyin

6  Perez; September 17, 1965.

7    THE COURT:  And what is your relationship to the

8  Defendant, Mr. Perez?

9    MS. PEREZ:  I've been his wife for 16 years.

10    THE COURT:  Are you legally married or similar to the

11  earlier case you are involved in a long-term relationship where

12  sometimes some people informally call a common law marriage?

13    MS PEREZ:  Yes, I am not legally married to Mr. Perez.

14    THE COURT:  Do you work, Miss Perez?

15    MS. PEREZ:  Yes, I am also part owner of the company

16  Best Transportation.

17    THE COURT:  That's your husband's company?

18    MS. PEREZ:  Yes.

19    THE COURT:  Do you have any kind of criminal record?

20    MS. PEREZ:  No.

21    THE COURT:  Are you a co-owner of the house at 3121

22  Southwest 151 Court?

23    MS. PEREZ:  Yes.

24    THE COURT:  What is the equity that you and your

25  husband have in that home?

1   MS. PEREZ:  We've owned that house for 16 years.

2   THE COURT:  All right.  So let me do a better job of

3   trying to ask -- Miss Perez, let me do a better job of asking

4   the question.

5   I am not asking how many years you have owned the

6   house.  I am asking for how much equity you and your husband

7   have in the house, which would be a dollar figure.  If you

8   don't understand exactly what I mean -- ma'am, you are going to

9   have to let me finish, please.

10   If you don't exactly know what I mean by how much

11   equity you have in the house, I will be happy to give you a

12   brief explanation.

13   Would you like me to give you an explanation?

14   MS. PEREZ:  Well, we have about $600,000 equity.

15   THE COURT:  Do you own any other real estate other

16   than the real estate on 151 Court?

17   MS. PEREZ:  Yes, we have a truck of an approximate

18   value of $60,000.

19   THE COURT:  So maybe a did a bad job of asking the

20   question.  I am talking about real estate, ma'am.  Like a

21   house, vacant land, an apartment, things like that.

22   Do you and your husband own any other kind of real

23   estate?

24   MS. PEREZ:  No.

25   THE COURT:  Are you willing to be a co-signer on the

1  bond?

2        MS. PEREZ:  Yes.

3        THE COURT:  Do you understand the consequences which

4  might arise by being a co-signer on the bond?

5        MS. PEREZ:  Yes.

6        THE COURT:  Mr. Tamen, do you have any questions you

7  would like to ask Miss Perez?

8        MR. TAMEN:  No.

9        THE COURT:  Thank you.

10        Let's talk now to the woman behind you in the green

11  shirt.  Good afternoon, ma'am.  Come a little closer, please.

12  Tell me your full name and date of birth.

13        MS. A. PEREZ (Through interpreter):

14        Anais Perez; July 18th, 1938.

15        THE COURT:  And you are the mother of the Defendant,

16  Mr. Perez?

17        MS. A. PEREZ:  Yes, sir.

18        THE COURT:  Do you work outside of the home?

19        MS. A. PEREZ:  No, I am already retired.

20        THE COURT:  What kind of work did you do?

21        MS. A. PEREZ:  I worked at an electronics business in

22  Fort Lauderdale.

23        THE COURT:  And you own a house or any kind of real

24  estate?

25        MS. A. PEREZ:  Yes, I have an apartment.

```
1              THE COURT:  Do you own it?

2              MS. A. PEREZ:  Yes.

3              THE COURT:  Do you own it with your husband?

4              MS. A. PEREZ:  Yes.

5              THE COURT:  How much equity do you and your husband

6    have in that apartment?

7              MS. A. PEREZ:  It's just that it is as apartment for

8    people that are 55 years old or so, but we must own

9    approximately $40,000, a little over $40,000.

10             THE COURT:  Do you have any kind of criminal record?

11             MS. A. PEREZ:  No.

12             THE COURT:  You are willing to be a co-signer on a

13   bond?

14             MS. A. PEREZ:  Of course.

15             THE COURT:  And you understand what that means?

16             MS. A. PEREZ:  Yes.

17             THE COURT:  All right.  Mr. Tamen, any questions that

18   you have for please Ms. Perez?

19             MR. TAMEN:  No.

20             THE COURT:  Thank you.  And if we could have your

21   husband come to the lectern, please.

22              Good afternoon, sir.

23             MR. S. PEREZ:  Good afternoon, sir.

24             THE COURT:  Tell me your name, please.

25             MR. S. PEREZ:  Alberto S. Perez.
```

```
 1            THE COURT:  And your date of birth, sir?

 2            MR. S. PEREZ:  4/7 1939.

 3            THE COURT:  Are you still working, Mr. Perez, or are

 4    you retired?

 5            MR. S. PEREZ:  No, I'm retired.

 6            THE COURT:  What kind of work did you do?

 7            MR. S. PEREZ:  I was a driver for a company.

 8            THE COURT:  Do you have any kind of criminal record?

 9            MR. S. PEREZ:  No, none.

10            THE COURT:  Are you willing to be a co-signer?

11            MR. S. PEREZ:  Yes, of course.

12            THE COURT:  Mr. Tamen, do you have any questions for

13    Mr. Perez?

14            MR. TAMEN:  No, Your Honor.

15            THE COURT:  All right.  Sir, the gentleman in the

16    black T-shirt.

17            Yes, sir, good afternoon.  Tell me your full name and

18    date of birth, please.

19            MR. R. PEREZ:  Roberto Alexis Perez; November 23rd,

20    1967.

21            THE COURT:  What is your relationship to the

22    Defendant, sir?

23            MR. R. PEREZ:  I am his brother-in-law.

24            THE COURT:  What kind of work do you do?

25            MR. R. PEREZ:  I drive.  I am driver.
```

1       THE COURT:  Do you drive for Best Transportation?

2       MR. R. PEREZ:  Yes.

3       THE COURT:  Where do you live?

4       MR. R. PEREZ:  11811 Southwest 35th Terrace.

5       THE COURT:  Do you own that home?

6       MR. R. PEREZ:  Yes.

7       THE COURT:  How much equity do you have in the home?

8       MR. R. PEREZ:  About $100,000, $120,000.

9       THE COURT:  Do you have any kind of criminal record?

10      MR. R. PEREZ:  I had one.

11      THE COURT:  Tell me a little bit about that.

12      MR. R. PEREZ:  On the night of partying, I was found

13  in possession of cocaine.

14      THE COURT:  How many years ago?

15      MR. R. PEREZ:  It has been years.  About ten years,

16  more or less.

17      THE COURT:  Did you serve any jail time?

18      MR. R. PEREZ:  No.

19      THE COURT:  Did you go to trial?

20      MR. R. PEREZ:  I went on probation.  I went on a

21  program for drugs and alcohol.

22      THE COURT:  Are you still under any type of supervised

23  release?

24      MR. R. PEREZ:  No.

25      THE COURT:  Mr. Tamen, do you have any questions to

1    ask Mr. Perez?

2           MR. TAMEN:  No.

3           THE COURT:  All right.  Thank you very much, sir.

4           So, counsel, the other day I think you had here one of

5    your client's sons from North Carolina?

6           MR. PALLAS:  Yes, sir.

7           THE COURT:  And what about the other son?

8           MR. PALLAS:  The other son is in North Carolina and

9    couldn't make it.

10          THE COURT:  And what is the name of the other son?

11          MR. PALLAS:  Jorge Armando Perez.

12          THE COURT:  And the name of the son from North

13   Carolina, who was already here last week, what is his name,

14   please?

15          MR. PALLAS:  His name is Carlos Perez.

16          THE COURT:  Does Jorge Armando Perez own any real

17   estate either in North Carolina or any place else?

18          MR. PALLAS:  Yes, in North Carolina.

19          THE COURT:  And what about Carlos Perez?

20          MR. PALLAS:  No.

21          UNIDENTIFIED MALE SPEAKER:  Carlos has no property.

22          THE COURT:  Bear with me just a minute, folks.

23          Okay.  I will entertain argument, first, from the

24   Government.

25          MR. PALLAS:  They could be seated?

1        THE COURT:  Yes, thank you very much.

2        MR. TAMEN:  Judge, this Defendant is a Cuban citizen

3   who still holds a Cuban passport and is under a deportation

4   order.  Now maybe that we have not deported too many people

5   over the past decade, but that has changed somewhat.

6        In addition to which a new additional felony

7   conviction for credit card fraud is going to add additional

8   impetus to the slow turning wheels of deportation of Cubans.

9        So the fact is that there is a possibility that he

10  faces deportation to Cuba, which I am sure he is aware of.

11       THE COURT:  I am sorry for interrupting you, Mr.

12  Tamen.  I just had a thought and I don't get thoughts very

13  often so I need to act upon it.

14       Does your client, sir, have any family in Cuba?

15       MR. PALLAS:  No.

16       THE COURT:  Please continue.

17       MR. TAMEN:  What is important also is that he has no

18  ties to Gulfport, Mississippi, which is where these charges

19  were brought.  His only ties or connection to Mississippi is to

20  travel there for the purpose of fraudulent criminal activity.

21       His activity was obviously part of large scale ring

22  that was able to obtain huge numbers of other people's credit

23  card information from a multitude of financial institutions and

24  includes their personal identification numbers, such as dates

25  of birth and other information necessary to basically steal

1  other people's credit.

2          That is serious criminal activity.  It is dangerous

3  criminal activity.  It has devastating affects on the finances

4  of the victims.  And it also gives him almost unlimited

5  financial options if he wants to go some place other than where

6  he has been in order to hide out.  If he has connections to a

7  credit card fraud ring, he can finance that kind of flight

8  without the kind of difficulty that most other defendants would

9  have.

10          He is engaged in criminal activity in multiple states.

11  He leaves the State of Florida to go to Mississippi and to go

12  to Louisiana to commit fraud.  I think that all demonstrates

13  that this is somebody who does not have deep roots to Miami

14  that he can be counted on to stay there when he travels so

15  readily elsewhere on other people's credit card information.

16          He is facing charges that carry a mandatory prison

17  sentence.  Not a long one but, nonetheless he has been in

18  prison before twice -- well, once before and he is back again

19  now.  And the evidence against him is overwhelming.  He was

20  caught red-handed.  They've got pictures of him committing this

21  crime.  So he has considerable incentive to flee.

22          In addition to which he has an active warrant from the

23  State of Louisiana.  He is supposed to go to Mississippi, but

24  if he bonds out from Florida, he is going to be taken to

25  Kenner, Louisiana rather than going to Mississippi because they

1   have an active warrant for him.

2          And the fact that he has warrants in multiple states I

3   think is indicative of an incentive to flee.  Indicative of

4   lack of such ties to Miami that he really is rooted here as he

5   would have the Court believe.  And also shows that he poses a

6   danger to the financial safety of an unknown indeterminate

7   number of people through the connections he has to a credit

8   card fraud ring.

9          THE COURT:  So, Mr. Tamen, let me understand what you

10  are telling me.  You are saying that if I were to reject your

11  pretrial detention request and fashion a multi-factored bond.

12         And if Mr. Perez were to meet all the conditions of

13  that bond, then, he would not be released from custody.  He

14  would merely be transported from here to some sort of a lock-up

15  facility in Louisiana to deal with the charges there because

16  there is an active warrant from a state court in Louisiana.

17         MR. TAMEN:  That is correct.

18         THE COURT:  And he would not be able to make his own

19  arrangements to get from here to Louisiana.  He would be taken

20  there by law enforcement officials presumably on some sort a

21  bus that might take, who knows, anywhere from three days to

22  four weeks to get from here to Louisiana.

23         MR. TAMEN:  I am not familiar with the laws of

24  Louisiana.  So I don't know if his counsel would be able to

25  arrange for a bond to be posted before his appearance there,

1  but the normal course of events, they have a warrant there

2  would be a detainer lodged with the Federal Detention Center.

3          THE COURT:  Right.

4          MR. TAMEN:  So if he posted bond here, the Marshals

5  would call Louisiana and say we're holding your prisoner.  Come

6  and get him.  And they would use whatever means, probably a

7  slow moving bus to pick him up and take him back to Kenner,

8  Louisiana where he would have his court appearance and be able

9  to post bond there.

10         THE COURT:  And that is the one where the charge is

11 $400 or something like that?

12         MR. TAMEN:  Something like that.

13         It's a felony because it involves identification

14 fraud.  Computer fraud, I think is the specific charge.

15         THE COURT:  Understood.

16         All right.  Mr. Pallas, I am happy to hear from you,

17 sir.

18         MR. PALLAS:  Yes, Judge.

19         Just answering that last question, there are some

20 jurisdictions that may not elect to transport him.  I mean, he

21 probably would be transported to Louisiana, but sometimes they

22 say that's not a big enough deal for us to send somebody down.

23         So you can make a condition of bond that he

24 voluntarily, if released from custody, voluntarily go to

25 Kenner, Louisiana and surrender himself and post whatever bond

1   is there.  I am sure it is not a detention situation for a

2   $430, you know, ATM use, or credit card use.

3          But, Judge, back to some of the other items that Mr.

4   Tamen mentioned, he has --

5          THE COURT:  I'm sorry.  For just a minute, let me ask

6   Mr. Tamen a question because I do not really know how things

7   work in terms of the cooperation or interaction between

8   different law enforcement agencies, especially when it is

9   federal or state.

10         So Mr. Tamen has been with the U.S. Attorney's Office

11  for I am pretty sure at least 35 years; am I right, Mr. Tamen?

12         MR. TAMEN:  32.

13         THE COURT:  Well, I was about to say more than 30, but

14  close enough.  A long time.

15         So here's my question and if the Marshals Service

16  knows the answer, I know you didn't come here expecting to be

17  tested either, but if you know the answer, you could help me

18  out.

19         Here's my question.  So right now there is a detainer

20  lodged with federal officials.  So if I were to authorize Mr.

21  Perez to be released and if he met all the conditions of the

22  bond and got all the signatures and posted the *Nebbia* and put

23  the cash into the Registry of the Court and did all those

24  things, would the Marshals still retain the Defendant and

25  contact law enforcement officials in Kenner, Louisiana and say,

1  hey, we've got your guy here, come and get him, or do I have

2  the authority to say I am not going to focus on the detainer.

3  I am going to require this gentleman as part of the bond to

4  voluntarily appear on his own in Kenner, Louisiana and

5  surrender himself and make arrangements for bond there.

6       Do I have the ability to do that, or is the detainer

7  the be-all, end-all, and it really doesn't matter what the heck

8  I say, the detainer -- you will pardon the expression, trumps

9  everything?

10       MR. TAMEN:  I believe the detainer is a detainer.  He

11  would be held until Louisiana comes and picks him up unless --

12       THE COURT:  Thank you for that answer, Mr. Tamen.  Let

13  me just hear from the Marshals Service.

14       THE MARSHAL:  Your Honor, the first part is correct.

15  We are going to contact them.  I don't know what your authority

16  is.  So I don't know whether you could trump a detainer.  I

17  don't know the answer to that question, but I have texted my

18  management and they are finding out what to do.

19       THE COURT:  Right.

20       So, in other words, if there is a detainer from

21  Louisiana on a warrant there, can a Federal Magistrate Judge in

22  another district, for example, here in the Southern District of

23  Florida, release a Defendant and notwithstanding the detainer

24  require him to voluntarily appear?

25       In other words, would that be sufficient for your

1  office to release him or maybe say, look, Judge, nothing

2  personal, my friend, but your order means nothing to us and a

3  detainer is a detainer, is a detainer, and that is what we have

4  to go by?

5          THE MARSHAL:  I would have to ask, Your Honor.

6          THE COURT:  Okay.  So do you a phone that you can text

7  somebody?

8          MR. PALLAS:  Judge, if I may add, typically when there

9  are detainers -- and I am not even that certain there is one,

10 but if there are detainers, what happens is the holding

11 facility releases him once all the bond conditions are

12 satisfied.

13         I mean, releases him in the sense that you are free to

14 go.  However, we will, as a courtesy, hold you here pending

15 another jurisdiction to pick you up.

16         Now, they could contact that jurisdiction and they

17 tell them we have this person here, are you going to come and

18 get him?  And if they say, yes, they don't keep him forever

19 because there are financial concerns as well.

20         They is like usually either a ten-day limit or

21 something where if you don't come and get him in ten days,

22 you're gone and I know that is with immigration as well.

23         So sometimes they elect, you know, if it is a

24 worthless check case from Montana, sometimes they don't send

25 the calvary down to pick him up and get him.  They say, look,

1  either that or -- and many times if it's a situation where it's

2  a restitution of $403 sometimes those are even handled over the

3  phone and they could nolle pros the case.

4       I mean, I don't know what the situation is, but I do

5  know that if he satisfies the bond set by Your Honor, Kenner

6  Louisiana will be contacted if there is, in fact, a detainer.

7  And then, they will have the choice whether they feel it is

8  sufficient to come and get him or not.

9       You can, as a United States Magistrate Judge, can say

10 you can order as a condition of this bond that if Kenner

11 Louisiana does not come and get you, I order you as a condition

12 of bond and if you fail to abide by this condition, I will

13 revoke the bond.  And I will order you to, within ten days of

14 release, make it up to Kenner Louisiana and submit yourself to

15 that jurisdiction and to see what they do with you.

16       THE COURT:  So I have heard you say a couple of times

17 words that suggest to me that you are doubting Mr. Tamen's word

18 that there is, in fact, a detainer.  You have said a detainer

19 if there is one or I am not sure if there is a detainer and you

20 have said that three or four times.

21       So are you actually challenging the statement that

22 there is a detainer?  Because normally when an assistant U.S.

23 attorney, especially one who has been a prosecutor for 32 years

24 says to me, Judge, there is a detainer, I accept it at face

25 value.  I am not going to go behind it and say prove it.

1          MR. PALLAS:  No, Judge.  I didn't mean it that way at

2    all.  The only information that I have is I read it in the

3    Pretrial Services Report.  That's all I had.  I don't know, but

4    sometimes there are no detainers, or sometimes these warrants

5    have, you know, on the face of the warrant will extradite, will

6    not extradite, will extradite within 1500 miles.  Things like

7    that.

8          THE COURT:  Sure.

9          MR. PALLAS:  I don't know.  I don't doubt Mr. Tamen at

10   all.

11         THE COURT:  All right.  I was just wondering if there

12   was some sort of hidden message that you were trying to

13   communicate.

14         MR. PALLAS:  No, no, no, not at all.

15         MR. TAMEN:  He is a wanted person in the NCIC and the

16   warrant knows that the extradition in the surrounding states,

17   Texas, Mississippi, Alabama, and Florida.  So they will come

18   and get him from Florida.

19         MR. PALLAS:  Okay.  So that's better probably.

20         THE COURT:  So while we are waiting to hear from the

21   Marshal Service on that detainer issue, do we have any

22   information from Pretrial Services on the earlier question

23   having to do with strong armed robbery and whether or not that

24   constitutes a crime of violence under the Bail Reform Act.

25         THE PROBATION:  Judge, I spoke to my supervisor and at

1  first glance we were under the assumption that the Bail Reform

2  Act had more to do with the underlying offense.  In this case,

3  access device fraud.  So, therefore, it would not apply, but I

4  tried to explain to my office about what the Court was

5  concerned about the crime of violence.

6           THE COURT:  I am talking about F1D.

7           THE PROBATION:  Right, Judge.

8           So I understand, Judge.  So, in this case, I think we

9  would ask for more time to look into the matter because I don't

10 have the statute book with me.  I was trying to explain it to

11 her on my cell phone and we would have to have more time to

12 answer a question like that.

13          THE COURT:  All right.  Fair enough.  Thank you.

14          I interrupted your argument.  So please continue, sir.

15          MR. PALLAS:  Yes, Judge.

16          Another argument that Mr. Tamen made was that he has

17 no ties to Gulfport Mississippi, but Gulfport Mississippi is

18 the United States.  This is the United States District Court

19 and anywhere in the United States where he is allowed to travel

20 to he could go to very easily.

21          And I don't think he would stay here in Florida in his

22 home and purposely avoid Mississippi thinking that they are not

23 going to come and get him.

24          THE COURT:  What did you find out?

25          THE MARSHAL:  I just spoke to my Supervisor Candido --

1        THE COURT:  Yes.

2        THE MARSHAL:  And he stated that he has never seen a

3    Judge do that.

4        THE COURT:  Right.

5        So, in other words, a detainer is a detainer, is a

6    detainer.  You keep the gentleman here.  You contact the folks

7    in Louisiana.  They have a certain amount of time to pick the

8    prisoner up or not.

9        THE MARSHAL:  Correct.

10        THE COURT:  If they do, they do.  And if they don't,

11    then, you would just release him because the folks from the

12    other state have not timely acted.

13        THE MARSHAL:  Correct.

14        THE COURT:  All right.  Thank you for your help.  I

15    appreciate it.

16        Yes, sir.  Please continue.

17        MR. PALLAS:  Yes, Judge.

18        Also, I would note of the two offenses, the

19    trafficking case, which was in the 1980s and the strong armed

20    robbery case, I actually pulled both dockets and there is no

21    record of nonappearance for those cases.

22        In other words, he appeared and faced the music in

23    each of those cases.  He was placed under state probation on

24    the strong armed.  There was no probation violation, allegation

25    of failed to report, failed to pay, failed to move without

1   notifying probation.

2          And in fact, he was rewarded with a probation

3   termination of successfully, you know, early.  So I would

4   submit that that militates in favor of him appearing for court

5   appearances.

6          Judge, his ties to this community.  He has his mother

7   and father in their 80s here, U.S. citizens.  He's got two U.S.

8   citizen sons.  They are both in North Carolina.  One is a

9   homeowner himself.  The mother and father own a modest

10  apartment over 55 living apartment.

11         He has a substantial business and employs people and

12  has vans and has trucks and makes money.  He is stable.  He has

13  money to pay to post a bond and secure his presence.

14         And I submit to Your Honor that this is really -- I

15  mean, I don't want to diminish the charge, but you know, I

16  think the fact that it is even a question whether it is

17  something that he could be detained militates towards him not

18  being detained.

19         And I would submit that the *Giodonna* (phonetic) case,

20  which Judge Torres wrote, that was a case where it was worth

21  hundreds of thousands of dollars and 30 counts and of

22  substantial sums of money and that Defendant was not detained

23  in that case.  And I would submit that this Defendant should

24  not be detained either.

25         THE COURT:  So thank you for that.

1          All right, folks.  So here is the ruling.  Before I

2   tell you what my ruling is, I am going to tell you what my

3   legal conclusions are concerning the legal questions that we

4   have addressed today.

5          First of all, I find that it is appropriate for the

6   United States to request pretrial detention under the safety of

7   the community rule because of Section F1D.  The fact that Mr.

8   Perez has the two prior convictions which would constitute

9   crimes of violence.

10          So it doesn't mean that he is going to be detained.

11   It just means that legally the Government can use the statute

12   to make that argument.  So that is legal conclusion number one.

13          Legal conclusion number two is that the concept of

14   dangerousness encompasses economic danger.  And that the phrase

15   danger to the community or safety of the community is broader

16   than simply security or physical safety.  It goes beyond

17   physical harm to include nonphysical harm.  Including economic

18   harm.

19          So, for example, Counsel, as you indicated my

20   colleague Magistrate Judge Torres in the *Giodonna* case,

21   although ultimately he denied the Government's pretrial

22   detention request he did, in fact, conclude that economic

23   danger does, in fact, fall under the broad umbrella of

24   dangerousness.  So that is my legal conclusion as to that

25   issue.

1          Now, we get to the actual ruling, which is I am going

2    to deny the Government's request for pretrial detention because

3    I find that there is, in fact, a combination of conditions

4    which would assure the Defendant's presence and eliminate the

5    risk of generating danger to the community.

6          However, this will be a comprehensive multifaceted

7    serious bond, which is designed to alleviate the concerns

8    raised by the Government.

9          Before I go further, I will state that the Defendant

10   is not facing, at least here what we would think in the

11   Southern District of Florida, as a significant sentence.  The

12   Defendant is facing between two and-a-half and three and-a-half

13   years in prison.

14          So, in and of itself, that does not seem to generate a

15   strong incentive to flee.  Especially given the fact that he

16   has significant ties to the Southern District of Florida.

17   Including his common law wife, real estate ownership, operating

18   a business with approximately ten employees, family members, et

19   cetera.

20          I can tell you, Mr. Pallas, I do not buy into your

21   argument that the phrase ties to the community means the entire

22   United States.  Quite frankly, the way I view ties to the

23   community is twofold.

24          Ties to the community in the district where the

25   charges are pending, which would be Mississippi.  And also,

1  ties to the community where the Defendant resides if it is some

2  place other than the district.

3         So, for a case like this, I would like for ties to

4  South Florida and also ties to Mississippi.  The Defendant,

5  obviously, has significant ties to South Florida, but no ties

6  to Mississippi and that will be addressed in the ultimate

7  ruling.

8         So this will be a three-part bond.  It will be a

9  $500,000 personal surety bond to be co-signed by Ernesto

10  Naranjo, Zuyin Perez, Anais Perez, Alberto S. Perez, Roberto

11  Alexis Perez, Jorge Armando Perez, and Carlos Perez.

12         All of the co-signors who have any interest in real

13  estate, and there are several, will not be able to sell, or

14  transfer, or convey any interest in real estate and may not do

15  anything at all to affect the title to any real estate.

16         In addition, this will be a $250,000 ten percent bond

17  with a *Nebbia* condition and you will need to fill out the

18  *Nebbia* form concerning the source of the $25,000.

19         In addition, a $150,000 corporate surety bond.  There

20  are also significant nonmonetary conditions, which I am going

21  to outline for you right now.

22         Mr. Perez will need to surrender his passport and

23  travel documents to Pretrial Services and he may not seek or

24  apply for any additional passports or travel documents;

25         He will need to report to Pretrial Services as

1  directed;

2          He may not possess any firearms, ammunition, or

3  dangerous devices;

4          You may not, Mr. Perez, visit any commercial

5  transportation establishments.  Let me tell you what that

6  means.  A commercial transportation establishment is a place

7  like an airport, a train station, a bus station, or a marina.

8  And it means that you cannot go to those places for any reason

9  at all.

10          In other words, the restriction is broader than don't

11  go to those places to travel.  You can't go to those places at

12  all for any reason.

13          So, for the sake of discussion, let's just say that

14  three weeks from now your wife says to you, Jorge, can you give

15  me a ride to the airport.  You will not be able to give her a

16  ride to the airport even if you, yourself, are not planning --

17  sir, you have just taken off your headphones.

18          THE DEFENDANT:  I understand.

19          THE COURT:  So if you are found to be on the airport

20  property you will be found to be in violation of your bond.

21  And the Government can seek to revoke your bond and it will not

22  be an adequate excuse to say but, Judge, I wasn't planning on

23  traveling anywhere.  I was just giving my wife a ride.

24          In addition, you will be on home confinement with

25  electronic monitoring to be paid for by you.  The only

1   exceptions are to come to court as required, which would be

2   court in Mississippi or perhaps Louisiana, to go to a hospital

3   emergency room for your own medical emergency, to go to a

4   doctor or a scheduled doctor's appointment, to meet with your

5   attorney or a member of your attorney's legal team, such as an

6   associate, a paralegal, or an investigator.  Attending

7   scheduled religious services, if that is something that you do

8   and also for employment.

9        However, there are certain things I need to tell you

10  about your employment.  You may not work any place, even if it

11  is your own business at Best Transportation, if you have access

12  to credit cards, credit card devices, access devices, or the

13  personal information of others.

14       In addition to that, I will note that this particular

15  company is a transportation company.  I don't know if you,

16  yourself, are a driver.  But even if you are, you will not be

17  able to work and drive outside of the Southern District of

18  Florida.  Your travel is restricted to the Southern District of

19  Florida and Mississippi for court, but no other place for any

20  other reason.

21       So if you are a driver for your company , I don't know

22  if you are, but if you would plan on driving a truck from Miami

23  to Jacksonville, for example, in order to drop off cargo for a

24  client, you won't be able to do that because you are not

25  allowed to drive outside of the Southern District of Florida.

1          Do you understand the nature of that restriction?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  So, in addition, when we talk about home

4   confinement, other than the exceptions that I just listed, I

5   want to give you an illustration of what I mean by that.

6          Let's say about three weeks from now you have been

7   released and your next door neighbor says to you, Jorge, we are

8   roasting a pig next door for Christmas day.  Why don't you come

9   over and have dinner with us to celebrate the holiday.

10         And this is your next door neighbor 50 yards away, you

11  will not be able to go to that barbecue because that is not one

12  of the listed exceptions for home confinement.  There is no

13  exception for Christmas day dinner or is it *noche buena, buena*

14  *noche?*

15         THE DEFENDANT:  *Noche buena.  No exception for noche*

16  *buena* meal.  You have to remain at your house.

17         And if you are found to be outside of your house and

18  it is not within one of the limited exceptions I provided, you

19  will be in violation of the terms of your bond.

20         Do you understand that restriction?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  All right.  Now let's talk about the

23  detainer.  If you meet all the conditions of this bond there is

24  a detainer and the Marshal Service will still hold you because

25  there is an outstanding warrant from Louisiana.

1        If for some reason law enforcement officials from

2   Louisiana do not timely come here to Miami to pick you up and

3   transport you back to Louisiana, then, I am ordering you to on

4   your own to appear in Louisiana and to surrender yourself.

5        And just so the Marshal Service is clear, I am not

6   overriding the detainer.  I am not saying ignore the detainer.

7   I am saying the detainer is in place.  You contact the folks in

8   Louisiana.

9        And based on what I have heard from Mr. Tamen,

10  presumably, they are going to send somebody here because

11  Florida was in that list of states where they said we are

12  willing to extradite.  I think they indicated Georgia, Florida,

13  and maybe one or two other states.

14       So, are there any other special conditions suggested,

15  Mr. Tamen, by the U.S. Attorney's Office that I have not

16  already covered?

17       MR. TAMEN:  Nothing, Your Honor.

18       THE COURT:  Any other special conditions from Pretrial

19  Services?

20       THE PROBATION:  The only one, Judge, would be if his

21  travel would be also permitted to Louisiana in that situation.

22       THE COURT:  You know, I am not a gambling man, but I

23  could tell you to use an expression that my dad used to use.  I

24  am going to bet you dollars to donuts that if we read the

25  transcript, I said travel is extended to Mississippi and also

1   Louisiana.

2            THE PROBATION:  Very well.

3            THE COURT:  I am very sure I said that, but if I did

4   not, I am saying it now.

5            THE PROBATION:  Okay.

6            THE COURT:  Any others?

7            THE PROBATION:  No, Judge.  Thank you.

8            THE COURT:  Okay.  Folks.

9            MR. PALLAS:  Judge, I do.

10           THE COURT:  Yes.

11           MR. PALLAS:  The prohibition about the train station

12  or marina, is he permitted to fly to Mississippi?

13           THE COURT:  Of course, yes.  Thank you for that

14  clarification.

15           MR. PALLAS:  Okay.

16           THE COURT:  You are allowed to go to a commercial

17  transportation establishment in order to go to a jurisdiction

18  for a required court appearance.

19           Let me make sure that everybody understands what that

20  means.  Let's say everything works out for you and you are

21  released.  And a month and-a-half from now you fly from Miami

22  to Mississippi for a court appearance.  So far so good.

23           And then, on the way back you say, you know what, I am

24  going to fly back with my wife and we are going to stop off in

25  Orlando for two days to go to Disney World.

1          Do you think you could do that?

2          THE DEFENDANT:  No.

3          THE COURT:  Correct.

4          You couldn't do that even if you were driving.  But,

5    in any event, you certainly couldn't go to a commercial

6    transportation establishment, like an airport, to fly from

7    Mississippi to Orlando because that is not a permitted limited

8    exception.

9          Any questions?  All right.  Mr. Tamen, any questions

10   about the ruling?

11         MR. TAMEN:  No, Your Honor.

12         THE COURT:  All right.  Folks, thank you for being

13   here with me today and spending at least a good chunk of the

14   afternoon.

15         We will be in recess.  Thank you.  Take care.

16         MR. PALLAS:  Thank you, Judge.

17   (Proceedings reopened:)

18         THE COURT:  I think the equipment is back on.

19         So, Counsel, I am asking you what your position is on

20   the removal issue for the removal hearing sometimes called the

21   identity hearing.  Are you waiving the identity hearing?

22         MR. PALLAS:  Yes, Your Honor.

23         THE COURT:  Would you arrange for your client to sign

24   the waiver form for that?

25         MR. PALLAS:  I will.

1          THE COURT:  So as long as he is here in court we might

2   as well do that now.

3          MR. PALLAS:  Absolutely.

4          THE COURT:  Listen, it was Tammy who reminded me.  So

5   kudos to Tammy to have the insight to focus in on that.

6          Okay.  Folks, thank you.

7          (Thereupon, the proceedings concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              CERTIFICATE

3

4          I hereby certify that the foregoing transcript is an

5    accurate transcript of the audio recorded proceedings in the

6    above-entitled matter.

7

8

9

10
     12/30/18                        Bonnie Joy Lewis,
11                           Registered Professional Reporter
                                CASE LAW REPORTING, INC.
12                               7001 Southwest 13 Street,
                               Pembroke Pines, Florida 33023
13                                   954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25